UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

*v.*

WILLIAM TISDOL

Crim. No. 3:20cr264 (JBA)

June 9, 2021

**RULING GRANTING DEFENDANT'S MOTION TO SUPPRESS**

Defendant Tisdol was indicted on one count of possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k), on December 29, 2020 (Indictment [Doc. # 1]). In anticipation of the Government's use of evidence from his phone at trial, Mr. Tisdol brings this motion to suppress all evidence from one red-colored Apple iPhone, arguing that the device was unlawfully seized, the Government impermissibly delayed requesting a warrant, and that the warrant, as issued, was unconstitutionally broad. (Def.'s Mot. to Suppress [Doc. # 17] at 1.) The Government opposes. (Gov't's Mem. in Opp. [Doc. # 21].) An evidentiary hearing regarding the constitutionality of the search and seizure of the phone was held on May 25, 2021. For the reasons that follow, the Court concludes that law enforcement impermissibly delayed seeking a search warrant and the good faith exception to suppression is inapplicable. Thus, evidence obtained from the unconstitutional search of the phone is suppressed.

I.      **Background**

Mr. Tisdol was shot on September 9, 2020 while sitting with his girlfriend in a car outside of his grandmother's house. Bleeding, he retreated inside the house, where he collapsed and was found in critical condition by emergency medical responders. He was transferred to the hospital where doctors stabilized him, despite his life-threatening injuries. While hospitalized, Mr. Tisdol was arrested on a pending

state warrant for unrelated charges of armed robbery, kidnapping, and unlawful discharge and possession of a firearm. Upon release from the hospital, he was transferred to the MacDougall-Walker Correctional Institution where he remains detained today.

While Mr. Tisdol was being transported to and treated at the hospital, Hartford Police Department (HPD) Detectives Scott Parker and Jaegar Thomas, who is also designated as a Task Force Officer on financial and economic crimes with the FBI, arrived at the scene to conduct an initial investigation. Detective Parker was assigned as lead investigator. Detective Thomas had a special interest in the incident because he had an active arrest warrant for Mr. Tisdol for unrelated federal retail theft charges. Detective Thomas had spent the morning on the same street as the shooting incident looking for Mr. Tisdol but had returned to HPD Headquarters after coming up empty-handed. After hearing Mr. Tisdol's name on the dispatch radio, Detective Thomas reported to the scene to help with the investigation and identify Mr. Tisdol, but he had already been transported to the hospital by the time Detective Thomas arrived.

Two types of shell casings and a single firearm with an obliterated serial number were recovered beside the car, alongside a pool of blood that trailed into Defendant's grandmother's house. Inside the house and beneath where Mr. Tisdol had collapsed, the police recovered a red iPhone 11. No one in the home claimed the phone, so HPD seized it, along with the firearm, as crime scene evidence.

DNA samples taken from the recovered firearm and buccal swabs taken from Mr. Tisdol were sent to the State of Connecticut Department of Emergency Services and Public Protection Division of Scientific Services ("State Lab") for testing on September 17, 2020. On November 4, 2020, the State Lab released its results to the HPD identifying Mr. Tisdol's DNA as a very strong match for that found on the gun. In

response, HPD Detective Parker submitted a warrant application to Connecticut Superior Court for Mr. Tisdol's arrest for unlawful gun possession.

For unexplained reasons, Detective Thomas only became aware of the DNA results on December 4, 2020. After learning of the results, Detective Thomas opened a federal investigation into the firearm with the obliterated serial number, withdrew Detective Parker's application for the state arrest warrant, and, on December 8, 2020, sought a federal search warrant for the phone that was in HPD custody. The application for the warrant was granted on December 14, 2020, and the phone and signed search warrant were given to Mr. Emanuel Hatzikostas, a senior digital forensic investigator with the FBI, about a week later.

Detective Thomas's affidavit submitted in support of the application for the search warrant states that the contents were "based on information that I personally learned or observed, as well as information that I obtained from other law enforcement sources." (Affidavit [Doc. # 18] ¶ 3). However, an unusual footnote to the affidavit states:

> The Government submits that the amount of time from seizure of the device to present has not been unreasonable under *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020). In concluding that a 31-day delay was too long, the *Smith* Court articulated four factors in determining whether a delay is reasonable: (1) the length of the delay; (2) the importance of the seized property to the defendant; (3) whether the defendant had a reduced property interest in the seized item; and (4) the strength of the Government's justification for the delay. First, the length of "delay" is only four days if measuring from the time that the undersigned affiant learned of the DNA link (December 4) to the time that a search warrant appointment was first requested (December 8). Second, the Government concedes that the importance of the cell phone to the defendant is significant. Third, the defendant has a substantially, if not totally, reduced property interest in the Target Telephone . . . . Fourth, the justification for delay is strong since the link between the TISDOL's DNA and the firearm in question was a critical component of the probable cause analysis outlined in this affidavit, in that it shows that TISDOL is responsible for a violation of 18 U.S.C. § 922(k) involving the Diamondback Model DB380 (as opposed to his assailant(s)). *Although the DNA report itself is dated November 4, 2020, the affiant [Detective Thomas]*

> *received the report from the officers assigned to the shooting investigation on December 4, 2020 and requested a search warrant appointment within two business days. Similarly, the Hartford PD officer [Detective Parker] who provided the undersigned affiant with the report confirmed, after discussion with the undersigned affiant, that he would be seeking a state arrest warrant related to the firearm on December 4, 2020.*

(*Id.* at 8 n.3) (emphasis added). The facts contained in the footnote are at odds with the hearing testimony. Both detectives testified that Detective Parker sought the state arrest warrant *prior to* Detective Thomas's viewing of the State Lab report and that, after seeing the results of the report, Detective Thomas *withdrew* the state warrant application so that he could pursue the unlawful firearm possession charge federally.

The affidavit opines that the delay should be measured from the day that Detective Thomas learned of the DNA results, December 4, until he submitted the warrant on December 8, even though HPD had the results as of November 4 and had had the firearm from the time it was seized on September 9. At the hearing, Detective Thomas testified that he was concerned about the length of the delay when he applied for the search warrant and had explained the reason for it to the magistrate judge. However, upon closer questioning, Detective Thomas clarified that he did not give a specific explanation for the delay to the magistrate judge because there was none. Nevertheless, when shown his affidavit by the Government, Detective Thomas then testified that he *had* included significant analysis about the delay in his affidavit, referring to the footnote, which he acknowledged he received assistance in drafting. Detective Thomas did not offer any further clarity about what he had actually explained to the magistrate judge beyond that which was included in the footnote of the affidavit.[1]

---

[1] Detective Thomas also did not identify any aspect of the subject phone's contents which he excluded from the search authorization sought, testifying that he believed that all of the data held in the phone could contain evidence that might connect Mr. Tisdol to the firearm.

Mr. Hatzikostas, a digital forensic examiner with the Federal Bureau of Investigation (FBI), testified that he extracted data from the iPhone in two steps – first he utilized the hardware GreyKey to pull all the physical data from the phone, and then he employed the software Cellebrite to transform the hard data into readable content for analysis by investigators. Mr. Hatzikostas stated that, although there was no way to limit the type or breadth of hard data extracted from the phone using GreyKey, once Cellebrite converted it to viewable content, he could have limited the content that he chose to share with the detectives. However, because the warrant authorized a complete extraction without any temporal or data-type restrictions, Mr. Hatzikostas included the entire viewable contents of the phone in his report to Detective Thomas.

Defense expert witness Mr. James Oulundsen, a registered forensic investigator with almost twenty years of experience in the field, testified that the GreyKey hardware is used to extract data from locked phones but that he, as an expert retained by criminal defense counsel, is prohibited from purchasing the GreyKey hardware as the company will only sell to law enforcement. He further explained how law enforcement could have conducted a more targeted digital search using Cellebrite after using GreyKey to get the phone's passcode. While GreyKey offered a complete extraction of the phone's contents, Cellebrite could limit what the forensic investigator viewed to conform to any search warrant limitations.

Defendant challenges the delay between the phone seizure and the request for a warrant and the breadth of the warrant as impermissible violations of the Fourth Amendment. In response, the Government argues that both the initial seizure of the phone and the length of delay in securing the warrant were within the bounds of the Fourth Amendment, and that the warrant was not overbroad because it permitted law enforcement to obtain the most complete set of data from the phone.

## II.     Discussion

### a.  Constitutionality of the initial seizure

Defendant raises three arguments to support his contention that the initial seizure was unlawful.  He argues that the seizure was not part of a search incident to arrest because Tisdol was a victim, not a potential offender, at the time the phone was seized and that neither the exigency nor plain view exceptions to the warrant requirement apply. (Def.'s Mem. at 5-9.) The Government argues that the initial seizure was justified by the exigent circumstances of the shooting scene and to prevent the destruction of evidence. (Gov't's Opp. at 8-9.) It further argues that, although Mr. Tisdol was not arrested initially at the scene of the crime, he was placed under arrest soon thereafter and the phone should therefore be treated as a seizure incident to arrest. (*Id.* at 10-11.)

Neither the Defendant nor the Government properly apply the Supreme Court's holding in *Riley v. California*, which permits the warrantless *seizure* of a cell phone, but requires a warrant to *search* it.[2] 573 U.S. 373, 396 (2014) (upholding the seizure of a cell phone but requiring a warrant to search because "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse" as "a cell phone search would typically

---

[2] Both the Defendant's and Government's arguments about exigent circumstances, plain view, and searches incident to arrest do not adequately apply the framework laid out in *Riley v. California* for the warrantless search of a cell phone. 573 U.S. 373, 381 (2014). In *Riley*, the Supreme Court held that exigent circumstances, like the imminent explosion of a bomb or kidnapping, may make the warrantless *search* of a cell phone objectively reasonable but that a case-by-case factual analysis is required to establish those circumstances. 573 U.S. at 402. While the Government argues that the need to identify the perpetrators of the shooting justified the seizure of the phone, it makes little sense why it then did not immediately seek to obtain a warrant to search the phone's contents. Thus, even if an exigency exception justified seizure, the Government's assertion of exigency would be belied by its own inaction as it did not seek a warrant to search the contents of the phone to identify the shooter until three months after the incident occurred.

expose to the government far *more* than the most exhaustive search of a house")

(emphasis in original).  However, because no one could reasonably claim a subjective

or objective expectation of privacy in an unclaimed phone left at a crime scene, law

enforcement acted reasonably in taking the phone, and the initial seizure was

constitutional.[3] *See Katz v. United States*, 389 U.S. 347, 352 (1967) (establishing that

for law enforcement to violate the Fourth Amendment, an individual must manifest

both a subjective and objective expectation of privacy in the item or area to be seized

or searched).

     b.  *Delay in securing the warrant*

From the time the phone was seized on September 9, 2020 until Detective

Thomas and the FBI obtained a warrant to search its contents on December 14, 2020,

the phone remained in the custody of the HPD. Defendant and the Government

dispute how the length of search delay should be measured, with the Government

arguing that they waited only four days after probable cause to search had been

established by the DNA results and Defendant arguing that the delay extended from

the initial seizure of the phone in September to the Government's application for the

warrant on December 8. Undoubtedly, the Government's probable cause to search the

phone was significantly strengthened by the DNA report, which connected the illegal

gun to Mr. Tisdol, but the Government's contention that the delay began only once

Detective Thomas became aware of the test results is unpersuasive.  In the Court's

view, the length of delay is properly measured, at best, as the thirty-four days

---

[3] The abandonment doctrine does not apply to this analysis because both detectives testified that they believed the phone to be that of Mr. Tisdol, who was in critical condition when removed by paramedics and thus could not have intended to leave his phone behind. *See United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (noting that an owner must have manifested an objective intent to abandon the item for the doctrine to apply). Therefore, although the police acted reasonably in *seizing* the unclaimed phone, Mr. Tisdol retained both an objective and subjective expectation of privacy preventing the warrantless search of the phone's contents.

between when the State Lab released the results to the HPD on November 4 and when Detective Thomas sought a search warrant on December 8.

To determine if this delay was reasonable, the Court is guided by *United States v. Smith*, which sets out the four factors used to analyze the reasonableness of governmental delays in securing warrants in the context of the seizure of a defendant's tablet computer. 967 F.3d at 198.

> [T]he following four factors are generally relevant to whether the police have waited an unreasonable amount of time before seeking a search warrant: [1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay.

*Id.* at 206 (finding a thirty-day delay in applying for a search warrant unconstitutional and not excused by the state's argument that the lead investigator was responsible for a large geographical region and had a significant caseload). Applying these factors to the present case, factors one and four weigh against the Government, factor two weighs in favor of the Government, and factor three is neutral. On balance, for the following reasons, the Court finds that the delay in seeking the search warrant for Defendant's phone was unreasonable.

In *Smith*, the Second Circuit gave "independent weight to the length of delay" and held that "a month-long delay well exceeds what is ordinarily reasonable" because "if the police have probable cause to seize an item in the first place, there is little reason to suppose why they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant." *Id.* at 206-07. Here, the delay between the positive DNA test results establishing probable cause and the application for the warrant was thirty-four days and thus "well exceeds what is ordinarily reasonable." *Id.* Therefore, this factor weighs in favor of Defendant.

In its application for a warrant, the Government "concede[d the second factor of the *Smith* test,] that the importance of the cell phone to the defendant is significant."

8

(Affidavit at 8 n.3.) However, in its objection to Defendant's motion to suppress, the Government argues that the phone could not have been important to Defendant as he was unable to use it while incarcerated. (Gov't Opp. at 16.) Notwithstanding the Government's initial concession, the Court agrees that, while cell phones generally are of significant importance to their owners, the importance of this cell phone to Mr. Tisdol was diminished at this time because he was incarcerated and would not have been able to access it even if it had not been seized. *See Smith* 967 F.3d at 208 (noting that, while smart devices generally are of great importance to their owners, the device in question was not important to the defendant because "he did not request the return of the tablet" and had other ways to accomplish the same tasks without his device).[4] Thus, this factor weighs in favor of the Government.

The third *Smith* factor examines the strength of the property interest in the seized item to be searched. A multitude of elements comprise the strength of this property interest, including the inherent criminality of the seized item, whether the defendant willingly relinquished the property to the state or otherwise consented to search or seizure, the independent evidentiary value of the item, and the police's level of suspicion, meaning probable cause or reasonable suspicion, in seizing the item. 937 F.3d at 208-209. It is obvious that Defendant's cell phone was not inherently criminal and that Defendant did not voluntarily relinquish his phone nor otherwise consent to search. However, that the phone was left at the scene of the shooting, albeit as a result of Defendant's injuries and hospitalization, reduces his property interest in the phone, and its confiscation as part of an ongoing criminal investigation may have

---

[4] Mr. Tisdol similarly did not ask for his device, although this carries less weight because he was incarcerated and could not have it.

reduced that interest further.[5] *See Smith*, 967 F.3d at 209. Thus, Defendant's property interest is reduced, but not eliminated, and this factor remains neutral.

The last *Smith* factor regards the justification for the state's delay in petitioning for a warrant. Both Detective Thomas and the Government at the hearing acknowledged that *there was no "explanation" for the delay*.  Under *Smith*, even communication snafus, particularly within the same police department where each detective was aware that the other's investigation utilized crime scene evidence, do not excuse an extended delay. 967 F.3d at 210. This factor weighs in favor of Defendant.

*Smith* underscores that "the Fourth Amendment imposes a time-sensitive duty to diligently apply for a search warrant if an item has been seized for that very purpose, and all the more so if the item has been warrantlessly seized." *Id.* Here, the Government's complete lack of explanation for the month-long communication failure between two of the officers actively investigating matters pertaining to Defendant totally disregards the temporal limitations of the Fourth Amendment's reasonableness requirements, particularly when those requirements had been so recently and expressly clarified by the Second Circuit in *Smith*. Thus, as the record before the Court demonstrates that only one of the four factors weighs in favor of the Government, the Court finds the Government's delay to be unreasonable and violative of the Fourth Amendment.

    *c.  The Exclusionary Rule*

---

[5] The Government also argues that the phone had independent investigative value. However, while the phone was initially seized as part of the shooting investigation, no warrant was ever sought to search the phone for help in the investigation, and the perpetrators of the shooting were never identified.  If the Government believed that the phone held valuable information that could help identify the perpetrators of the shooting, reason suggests that they would have promptly pursued a search warrant on that basis.

Having found that the delay violates the Fourth Amendment, the Court must decide if the evidence obtained from the phone should be suppressed. The exclusionary rule, an equitable remedy designed to deter misconduct by law enforcement, "applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence." *Smith*, 967 F.3d at 211.  While the evidence obtained in *Smith* was not suppressed because the specific timing rule had not yet been announced and therefore an objectively reasonable officer would not have appreciated the constitutional consequence of a month-long delay in securing a search warrant, the Second Circuit explicitly put law enforcement on notice that month-long, unjustified delays will no longer be tolerated:

> All that said, we have stated and clarified principles above that shall guide law enforcement officers with respect to what circumstances establish an unreasonable delay under the Fourth Amendment. We have discussed how the length of delay has independent weight as a factor and how a delay of one month or more is ordinarily too long for an officer to apply for a warrant. We have described how seizure of personal electronic storage and communication devices must be given heightened consideration in terms of the defendant's interests. And we have explained how the general press of police business may not justify a lengthy delay absent particular evidence showing why other police duties reasonably took precedence. These principles shall likewise inform the application of the exclusionary rule in future cases.

*Smith*, 967 F.3d at 213. In articulating that its principles should be used to guide the application of the exclusionary rule, *Smith* essentially directed that unreasonably delayed search results caused by police department administrative foibles are unacceptable. Thus, the evidence obtained from Mr. Tisdol's phone should be suppressed.

d.   *The Good Faith Exception*

The Government argues that the good faith exception applies because the evidence was "obtained in objectively reasonable reliance on a subsequently

11

invalidated search warrant," *United States v. Galpin*, 720 F.3d 436, 452 (2d Cir. 2013) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)), and the officers acted in accordance with the limitations of the warrant. However, there are four instances where the good faith exception does not apply:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

Here, the Government's assurance in Detective Thomas's affidavit that the delay was only four days long and therefore did not violate *Smith*, (*see* Affidavit at 8 n.3.), misled the magistrate judge given that the delay began, at the latest, when the HPD received the State Lab report in November, and potentially much earlier when the phone was seized at the crime scene in September.[6] The facts recited in the footnote chronicled an order of events contrary to that described by both detectives at the hearing, and the footnote's implication that it was excusable that Detectives Parker and Thomas failed to communicate, even though they were investigating the same illegal firearm, because they operated in strictly isolated silos of state and federal law enforcement is misleading. The inclusion of the Government's legal analysis in the affidavit was outside the scope of what Detective Thomas could attest to as his personal knowledge, and the Government's failure to disclose a fulsome account of the Second Circuit's explicit directive in *Smith* demonstrates that the Government was aware of the applicable law but failed to apply it appropriately.

---

[6] Given that the detectives both testified they believed the phone belonged to Mr. Tisdol when they recovered it at the scene and that the firearm, with its serial number obliterated, was found next to a trail of Mr. Tisdol's blood, detectives likely had sufficient cause to move for a search warrant without the affirmative DNA evidence connecting the gun to Mr. Tisdol.

Knowing its constitutional obligation to act in a timely manner, law enforcement failed, without explanation, to obtain or seek a search warrant promptly after the test results were available to it, or even earlier immediately after the shooting, and the good faith exception does not apply.

Because the Court grants Defendant's motion on the grounds described above, it does not reach the issue of particularity. Interestingly, defense counsel points out important concerns raised by the experts' testimony that the GreyKey system cannot tailor the type or scope of its data extraction, notwithstanding any particularity requirements of a warrant. *See Galpin*, 720 F.3d at 445–46 (requiring that "the warrant must specify the items to be seized by their relation to designated crimes"); *United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir.1987) (finding overbroad a warrant authorizing the seizure of "any papers, things or property of any kind" relating to the specified crime because it failed to limit the type of evidence to be seized). The Government's natural desire to have a complete understanding of the facts, standing alone, likely does not always justify seeking the total inventory of an individual's history through the data on his or her cell phone. *See Galpin*, 720 F.3d at 447 (warning of the "enormous" "potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive"); *Smith*, 967 F.3d at 207 (emphasizing "the special concerns that apply when law enforcement seize and search people's personal electronic data and communication devices" because they contain "such vast quantities of irrelevant private material"); *Riley*, 573 U.S. at 393 (observing that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person[,] . . . notabl[y in] their immense storage capacity.") In other words, the completeness that the Government desires may be at odds with the particularity that the Fourth Amendment requires, but whether the Government's exclusive choice of GreyKey enables it to fulfill its constitutional

obligation of specificity in its digital searches of smart phones will be left for another day since the evidence from the phone is suppressed on alternative grounds.

### III.     Conclusion

For the foregoing reasons, Defendant's Motion to Suppress [Doc. # 17] is GRANTED, and no evidence obtained from the unconstitutional search of Defendant's cell phone will be admitted at trial.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of June 2021.